1291 David Jordan v. The United States May it please the Court, David Nathanson for Mr. Jordan. May I reserve one minute for rebuttal? Yes, you may. Thank you. David Jordan's right to a public trial, a right specifically guaranteed in our Sixth Amendment, was violated. Now, trial counsel did not object to that violation, either because he was ineffective or because he was reasonably unaware of the violation as it happened. And so as a roadmap for this argument, I intend to argue both ineffective assistance as cause for the procedural default, and counsel's reasonable unawareness as cause being an objective factor external to the defense, and then what is prejudice in this type of situation. May I ask you a threshold question before you get into those two arguments? It goes to the question of whether there was a violation here at all. You present the case on the assumption that there were three members of the public who ended up being allowed to remain in the courtroom, the two relatives of one defendant and one relative of the other. My question is, the rest of the courtroom was filled with a venerey panel, and until the members of the venerey, or some members of the venerey, are selected to be jurors so that I will assume, you know, they become official, not public at that point, why aren't the members of the venerey panel members of the public for purposes of the constitutional analysis? Well, there's a number of answers to that. The first answer is that the courts that have considered that, for example, I believe Gupta out of the Second Circuit considered that question and rejected it, but there's a practical reason. I'm governed by the Board of Bar Overseers ethical rules. I'm not permitted to contact anybody who's even a prospective juror. They cannot be the public. I'm restricted from even contacting them. So that's one very practical reason. Well, as a member of the public generally, you wouldn't have any reason to contact them unless they happen to be a witness. That puts the venerey in the same position as the great mass of the public. I don't think so, Your Honor. They're under the control of the court. They're under the control of the court officers at that point, and as I said, I'm restricted from interacting with them, and the courts that have considered this have rejected that. But don't the members of the venerey fulfill the same function, sitting in the courtroom, not knowing whether they're going to be jurors or not, that a member of the public would? I mean, we don't want monkey business going on in the courtroom. We want people there to see it so that it won't happen. They're there, and with the exception of 12 or 14, whatever the number ultimately impaneled might be, they walk out of the courtroom, and they can tell the world what happened inside. Well, I think there's two responses to that. The first is that it reminds me of the language in Gonzales-Lopez from the Supreme Court, which says that when there's a specific guarantee that's enumerated in the Constitution, you're a facsimile thereof. And I would submit that having the prospective jurors substitute for the public is a facsimile. Beyond that, if your Honor's... I mean, that's a fine figure of speech, but why? They can... I just said to you, they can walk out of that courtroom and say, hey, there was something funny going on in there. And their capacity to do that is one of the disciplines that is imposed upon the judiciary by the public access guarantee. Why therefore do they not fulfill the role of the public? They do not fulfill the role of the public because the people, if we want to focus on who they are and what they can do, the people here that were excluded were a newspaper reporter, a internal affairs investigator who was monitoring the case to determine facts having to do with No question that members of the public who were excluded to make room were valuable members of the public to have there. I don't think there's any argument about that, and I think you're entirely right in that point. But that point does not establish that the veneery panel, the members who were left, could not also be valuable for constitutional purposes. At this point, your honor, because I do not believe this was a question raised by the government's brief, I haven't fully briefed it. I've seen it in other cases, and if I may... I won't take more of your time on it. May I submit a letter collecting authorities on the point? At the end of the argument, I'll consult with the other judges and perhaps we'll permit some supplemental briefing on this, but why don't you continue with the two points that you were going to argue. One of those was your claim that counsel was not reasonably aware. That's right. But that's specifically contrary to a factual finding made by the district court. That's right, and we argued that Judge O'Toole's findings were a clear error. But his findings were based on a series of inferences from circumstances that are hard to argue with. I mean, counsel for the co-defendant, counsel for Bucci, said he thought that he told counsel for Jordan, but couldn't be sure of it. This was all done in open court. Everyone was there to see what happened. It's hard for me to understand how you can fault the district judge for making a factual finding when he says that a lawyer who says that he doesn't see what is perfectly apparent to be seen is mistaken. I find that he was reasonably aware. It's a pretty tough hill to climb. But I think it's the truth of the matter, and let me explain why. First of all, the testimony of Attorney Natola that you referenced, Judge O'Toole specifically discredited. He found that Attorney Natola's, Bucci's counsel, his memory was faulty, and he did not rely on it. Well, yes, but he didn't rely on it because it's pretty clear that Judge O'Toole thought that Natola really knew that he had told him and was trying not to throw Breschler under the bus. No, not at all, Your Honor. If you read the transcript. Not which I have. I impeached him with his admissions to me that he had previously not done that. So I think on that score, Judge O'Toole got it right in the sense that Attorney Natola's version of things was varying and sometimes self-contradictory and sometimes nonsensical in terms of the series of events, and they couldn't have occurred in the series that he propounded them. So I think we have to put Attorney Natola to one side. What we have is we have Attorney Drexler testifying. I was not aware of it. I didn't see it. It happened behind me as it's described to me, and I thought my approach to the law was this is something that would require an extraordinary justification, and so I think the fair inference is if it's something that he would think would be extraordinary, he would remember it, and he has no memory of it. Judge O'Toole does not recount at all in his findings the testimony of second chair, Attorney Louise, who testified that she had a specific memory of this jury impanelment, and that she would have recalled if somebody had called this to her attention, and she did not recall anybody calling it to her attention, and we have the stipulation of the trial prosecutor, who says, I can't be certain, but I don't recall anybody telling me. I don't remember hearing it. I don't remember seeing it. Counsel, isn't the premise of Judge O'Toole's factual finding, it's really, it's circumstantially based. Yes. I think he doesn't rely upon any kind of announcement or explicit statement that the courtroom is now going to be emptied of members of the public so that the jurors can come in. What he says is, how could attorneys sitting in that courtroom, perhaps in the front row, not be aware of a mass exodus of 12 to 25 people leaving the courtroom, followed then by all these jurors coming into the courtroom? How could an attorney not be aware of that? Isn't that really the basis for his factual finding? That is the way it reads, and so there's a factual problem with that, and there's a legal problem with it. The factual problem is that there wasn't 25 people leaving. The testimony is... It says 12 to 25, I believe. There's 12 to 25 people excluded from the courtroom, but the testimony establishes that there were seven, at most 10 people in the courtroom at the time of the exclusion. Three then returned. So what we have is seven people there originally, and then counsel had to be aware that seven people were gone and then three people returned. To me, that is not an inexorable inference that somebody, that there has been a mass exclusion here. Because the inference doesn't have to be inexorable. That's true. I mean, if the circumstances give rise to competing inferences, we've said over and over again that the district judge's choice between those competing inferences can't be clearly erroneous, and the inference that Judge Lopez has just suggested, which the district court drew, is certainly, it seems to me, a permissible inference from the record as I read it. I think there's an additional factor here. First of all, a trial judge abuses his discretion when he does not take into account all the factors before him, and it's my position, and I think it's borne out by the findings in the evidence, that he simply ignored what Attorney Louise testified to, and he ignored the stipulation from the trial prosecutor, which made it very reasonable to conclude that trial counsel was not aware, and there is the issue of the government previously taking the position in this litigation that counsel had no reason to be aware that people were being kicked out of the courtroom, and so now all of a sudden they're shifting position and saying counsel should have been aware, and I think that's not fair play, and I don't think it should be permitted. Counsel, just, if you would, perhaps you should move on. Yes. If we were to find that that factual finding was clearly erroneous, that the attorney knew about the closure, how does your argument spin out from there? As to ineffective assistance? Yes. So, it's laid out, I hope, fairly understandably in my brief, but it's simply that counsel testified that he had a strategy that the public presence is good for defendants generally and for this defendant specifically. He's a well-loved family man, police officer. He wants the public to see what's going on in his trial. That's his strategy. He doesn't implement his strategy, and a point that I don't think that I made as clear as I should have in the brief, which is that there's a question of whether it can ever be a reasonable strategy to not have a public trial. Didn't we answer that question in the Bucci case? Yes. As to Bucci, is it? So why is that question still open? I mean, we said in Bucci that there was a reasonable strategic choice to be made. There was a reasonable strategic choice, yes, because that was in fact the testimony as to Bucci's counsel. But the case law is clear that we look at this from the point of view in Bucci and in here from the point of view of objective reasonableness, not from the point of view of what some attorney in post hoc says that his subjective judgment would have been. I believe that's an inaccurate recitation of the law, Judge Selya, and I believe that if you, for example, if you look at Justice Souter's opinion in Ronpilla, that once you choose a strategy, that's the subjective part. What was your strategy? And then the objective part is how did you go about it? If you may create a disembodied objective lawyer and say, could he have been acting reasonably if there is no evidence as to what his strategy was? You've written quite a long brief, and you've got some rebuttal time to make your argument at that point. Your Honor, may I please support Randall Crum on behalf of the government? To address quickly, the government's view is the district court correctly decided that cause was not met for the reasons set forth in the opinion, and as the court has talked about, primarily this rests on the factual finding that Attorney Drexler did know, although six years later, he could not, in fact, remember one way or the other whether he had heard it. And the circumstantial evidence was sufficient to find, as this court has found circumstantial evidence may often be relied on even to meet the beyond reasonable doubt standard, that there were circumstances suggesting that he was aware of it even though he did not act. What do you say to your brother's accusation that the government isn't playing fair here because you originally took the position that this fact was unknowable or at least unknown, and you've now switched around and are urging affirmance of a finding that it was or should have been known to Drexler? First, I don't think there's actually quite the inconsistency that he suggests. The government said two things that are relevant to that argument. First, there was a stipulation by the government's attorney that he personally did not hear an announcement and that he thought he would remember, but he didn't know if he would remember if an announcement was made. So that was certainly, it was a factual statement as to what he heard or knew. As we pointed out in our brief, he was seated in a different position with respect to the announcement. He was, in fact, at a table in front of the defense counsel's table, and the announcement was made right behind the defense counsel's table where it was, according to Ntola, heard by him, who was seated right next to Mr. Drexler, that he may have heard it and the government attorney would not have makes sense in light of the setup of the courtroom and certainly could have been relied upon or considered by the district court. The second is the government did say in a brief that it wasn't a case in which anyone should have been sort of on the lookout or on notice of a courtroom closure, but that's not really the argument here. That was saying that this was not a case where there was information in advance suggesting that this was going to occur, but that's, no one is suggesting that that is not true rather that this, in fact, did happen without prior announcement, and then the question is how the attorneys reacted and what they knew. So I don't really see the inconsistency that he points to, but we do point out in our brief that government does not take inconsistent positions where it argues that the facts support a decision of the court, even if, in particular part, the government did not agree with those information in the record in support of that decision. So in our view, there was sufficient evidence to make that finding and from that finding that he was aware that the case is largely indistinguishable from the Bucci case, as the district court found. And the argument has been made and discussed that the defense counsel, Drexler, had a different strategy because he held perhaps different views about the importance of a public trial in this context. As we point out, that's not the kind of strategy that's been talked about when talking about whether a person, an attorney, can be ineffective in failing to execute a strategy. Rather, that kind of strategy is what was discussed in Wiggins v. Smith, which cited in the reply brief, where the defense counsel actually marshaled a mitigation strategy in the penalty phase when a death penalty case told the jury that they were going to hear evidence about the horrible childhood as mitigation evidence and then failed to either research or present such evidence. Clearly, in that case, a strategy had been joined that required that the attorney had to follow through on. But there's no similar strategy that had actually been begun here. Simply what we have is sort of thoughts after the fact about what the values were that might have been served rather than a particular strategy that was or was not followed. Counsel, maybe I should address this to opposing counsel, but in a scenario, if we were to find that Judge O'Toole, his factual finding that the attorney was aware of the closure, that's clearly erroneous, wouldn't the next question have to be whether the issue would not be ineffective assistance to counsel? The first issue would be whether there was cause for some external factor that accounted for that lack of awareness. Isn't that how the analysis would have to go? And I think Judge O'Toole understood that that's how the analysis works. That is how the analysis works, although I think that the wrinkle on that that I would say is that I think that under Murray v. Carrier, ineffective assistance can be that external impediment. Because the rationale of Murray v. Carrier is that, as a threshold matter, external impediment refers to something external to the defense, an objective factor external to the defense that prevents them from becoming aware of the information that would lead to an objection. And as we point out, this is not that at all. It happened in open court and a nearby attorney heard it. So the idea that merely failing to notice something in front of you is external to the defense, we expand that category. But you can't establish the external cause, and your fallback would be the ineffective assistance to counsel. Isn't that correct? The fallback is because the rationale of Murray v. Carrier is that a counsel who is constitutionally ineffective, his errors are charged to the state, and therefore it is external to the defense at that point. So that's the rationale of the opinion, and that's why we do address the ineffectiveness argument, the separate ineffective argument, in this context rather than separately. Because if there were constitutional ineffectiveness in failing to notice it, arguably it could constitute the external impediment needed to satisfy the cause requirement. But as we point out, the Supreme Court precedent is clear that it's going to be a rare case where a single omission or a failure of attention would rise the level of constitutional ineffective assistance. This is not a case where there's a suggestion that this attorney was congenitally unable to attend to things and was missing things left and right. Rather, the suggestion was the contrary, that he was focused on a very important task, and if he failed to attend, it falls within the discussion in Richter that an attorney can't be faulted for attending to one thing and not another that might seem to be less important under the circumstances. Here, focusing on 60 juror questionnaires would reasonably have been viewed as more important than making sure that he knew exactly what was happening behind him or that he fully understood what had just been announced. That's why in the government's view, while the factual finding disposes of it, in the end, the answer is the same either way. And we do point that in our brief, that in the end, the Supreme Court did not find that he knew that the result would be the same. One further point I want to make, just by way of clarification, and in a footnote 9 of our brief, we point out the fact that Attorney Antola said that he told Attorney Drexler and that that had been rejected. In reading my brief, I realized through inartful phrasing, I was suggesting that this Court should rely on that fact finding, despite the fact that it was particularly discredited. That wasn't the intent of the footnote, was to point out that this Court can absolutely rely on the fact that Antola said that he himself heard, even if it does not credit the further fact that this Court did not credit that he told Attorney Drexler. Because the two were seated either next to each other or one person apart from each other, and therefore, it's part of the circumstances that suggest that Drexler would have known. And so even without the further fact that he said that he told him, I think there's sufficient evidence to support the fact finding. Mr. Cromley, Justice Souter has raised an interesting point about whether members of a public trial analysis. Would you like to respond to that now, or do you share the Petitioner's view that perhaps some supplemental briefing would be helpful on that? I think supplemental briefing would be appropriate. I know that both of us were acting, writing under the sort of, in the shadow of the earlier Boutry opinion, which treated them as not members of the public, you know, repeatedly referred to three members of the public, not to 63. And therefore, in looking at it that way, I'm not saying that that was a sort of law of the case. It wasn't an issue that was joined either way, but simply that we were writing in that way. But it was never suggested to the panel in the Boutry case that this possibility was never considered. So I think we would prefer also to address it after some reflection. The one other point I want to make, just because it was raised in the reply brief, is the question of whether there's an additional procedural default, unexcused procedural default on appeal. And we point out that, in fact, that issue wasn't really discussed below, but it's clear under Frady, and it's clear in the Court's first Boutry opinion, that a person like Jordan, who doesn't raise it at either, in that trial or on direct review, has committed two procedural defaults that have to be excused. And the response in the reply brief is that that isn't true here, because the co-defendant raised it, and it was rejected as unright, because the record wasn't developed fully enough. But I don't think that's really the answer. The procedural default doctrine exists to ensure that everybody raises an issue and continually does so at every opportunity that they have to raise it. The mere fact that, as it turned out, there wasn't a record sufficient to address the issue, and therefore the First Circuit couldn't reach it then, doesn't excuse the failure to raise it in the first place. And I would also note that, even if it could be said that Jordan knew, and he hasn't said this, that it would be unsuccessful on direct review, that also wouldn't excuse it. Under Bousley, it's clear that even if you know it would be futile to raise a point, it doesn't excuse your procedural default in failing to make the attempt. So while it hasn't been a focus, I think it's important to note that there's never been any explanation for why appellate counsel did not join Mbuchi's attempt to raise it on direct review, and that that is a separate procedural default that's never been explained. There's other issues related to prejudice, but as district court never reached those largely stands and falls on the question of cause. If the court doesn't have any further questions, we'll rely on the brief for the remaining issues. Thank you. Thanks. We have some rebuttal time reserved. As briefly as I can, Your Honor, I just want to explain to the court why, as to ineffective assistance, the objective analysis, disembodied from what counsel says his strategy was, should not be the inquiry. And that is because you can always invent a reason for wanting a closed courtroom. That was the case in Press Enterprise. The defendant, in that case, wanted the courtroom closed for a complete closure. And that is clearly not the law. In Owens, this court said it would presume unreasonableness in a complete closure. And in fact, in this case, when the closure was happening, if you assume that counsel knew what was going on, which I don't agree with, but if you assume, as Judge O'Toole did, that counsel knew what was going on, as it was happening, it was going to be a complete closure until a member of the public said, this is not right. So if it was going to be a complete closure, counsel should have objected at the time, and it was unreasonable for him not to. Thank you. Thank you, counsel. Counsel, I directed, filed simultaneous supplemental briefs, not to exceed 10 pages, within one week from this date, limited to the issue of whether members of the veneer can and should be treated as members of the public for purposes of this public trial inquiry. Thank you, gentlemen.